J-A21028-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JAMAL JONES | : | |
| | : | |
| Appellant | : | No. 1893 EDA 2020 |

Appeal from the Judgment of Sentence Entered January 18, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s):  CP-46-CR-0006906-2017

BEFORE:   KUNSELMAN, J., NICHOLS, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY NICHOLS, J.:            **FILED NOVEMBER 19, 2021**

Appellant Jamal Jones appeals *nunc pro tunc* from the judgment of sentence imposed following his jury trial and convictions for attempted first-degree murder, conspiracy to commit first-degree murder, aggravated assault, conspiracy to commit aggravated assault, and possession of an instrument of a crime (PIC).[1]  Appellant challenges the sufficiency of the evidence supporting all of his convictions.  After review, we affirm in part, and vacate in part as to the sentence for conspiracy to commit murder.

We adopt the facts and procedural history set forth in the trial court's October 24, 2019 opinion.  **See** Trial Ct. Op., 10/24/19, at 2-16.  Briefly, on the night of August 8, 2017, Appellant, Jahleel Davis (co-defendant), and

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 901(a), 2502(a); 903(a)(1), 2502(a); 2702(a)(1), 903(a)(1), 2702(a)(1); and 907(a), respectively.

Taron Ebo-Wilson[2] shot Kendall Rosendary in Norristown, Pennsylvania.[3] At that time, Rosendary was walking on Cherry Street near a playground. Rosendary heard people yelling, and he ran when he saw someone with a gun. Appellant, co-defendant, and Ebo-Wilson shot Rosendary multiple times. Rosendary was rushed to a hospital and survived. Rosendary could not identify who shot him, but told police that at least three men, all of them armed, had attacked him. Rosendary also recalled that two of the attackers were wearing dark hooded sweatshirts.

Norristown Police chased a Chevrolet Impala that left the vicinity of the shooting at high speed. The Impala pulled onto Cherry Street and three individuals fled the Impala on foot. The police recovered a .38 Special caliber revolver containing six fired cartridge casings and a magazine from a .40 caliber Glock Model 27 handgun from the Impala's interior.

The police searched the area around where the Impala stopped and arrested Appellant and Ebo-Wilson hiding under a back porch in the early morning hours of August 9, 2017. The police recovered a .40 caliber Glock

---

[2] Ebo-Wilson pleaded guilty to attempted murder and conspiracy to commit murder in connection to the Rosendary shooting on October 12, 2018. Appellant and co-defendant Davis's joint trial for charges related to the Rosendary shooting lasted from October 26, 2018 to November 2, 2018.

[3] The shooting of Rosendary was related to a series of shootings involving rival groups of young men from Norristown and Pottstown. Appellant, co-defendant, and Ebo-Wilson intended to kill a member of the Norristown faction in retaliation for the murder of Jordan Scott, a member of their Pottstown faction. Rosendary was not affiliated with either group.

Model 27 handgun from the area where they arrested Appellant and Ebo-Wilson. When the police patted down Appellant, they discovered a Chevrolet car key. Appellant told the officers that it was the key to his Impala. The police matched Appellant's key to the abandoned Impala on Cherry Street.

The police arrested co-defendant Davis in a nearby backyard. The police found a .45 caliber Para-Ordnance handgun and a black hooded sweatshirt near the area where they arrested co-defendant. The police also recovered cell phones from the Impala and from Davis.

The police recovered both fired cartridge casings of various calibers and bullet fragments from the scene of the shooting. Detective Eric Nelson of the Montgomery County Detective Bureau, an expert in the field of forensic firearms identification and analysis, testified that he examined the aforementioned firearms as well as fired cartridge casings, bullets, and bullet fragments that the police recovered from the scene of the Rosendary shooting. Detective Nelson opined that the Glock Model 27 firearm recovered near Appellant and Ebo-Wilson fired the .40 caliber fired cartridge casings he examined. Detective Nelson also concluded that a single firearm had fired the recovered .45 caliber cartridge casings, but the Para-Ordnance pistol the police recovered when they arrested co-defendant Davis did not fire those .45 caliber cartridge casings. Detective Nelson further testified that some of the bullets and bullet fragments that were recovered from the scene of the shooting were consistent with bullets fired from the Glock Model 27 pistol and others were consistent with bullets fired from the .38 Special caliber revolver.

The police also recovered several 9mm caliber fired cartridge casings from the scene of the shooting, but the police never recovered a 9mm caliber firearm after the shooting.

The Pennsylvania State Police Harrisburg Regional Crime Lab found gunshot residue on the sweatshirt recovered near co-defendant Davis. Albert Lattanzi of the Harrisburg Crime Lab testified that the presence of this residue on the sweatshirt was consistent with the recent firing of a gun by the wearer of the shirt or that the shirt's wearer was near someone else who was firing a gun.

The police performed swabs on the firearms they recovered from to test for DNA. The parties stipulated, in relevant part, that the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of the Impala contained a mixture of DNA from at least three individuals, and it was 19,660 times more likely that co-defendant Davis was one of those three individuals than a random person. DNA swabs taken from the Glock Model 27 pistol contained a mixture of DNA from at least two individuals, and it was over one million times more likely to have come from Ebo-Wilson than from a random person.

Appellant and co-defendant Davis' cell phones contained videos and photographs depicting various firearms. Davis also made numerous posts on Facebook expressing his desire to get revenge for the death of Scott, that he intended to "grab bigger guns", "mask up", and "catch another body."

- 4 -

Co-defendant Davis testified that he, Appellant, and Ebo-Wilson attended a party in Norristown on August 8, 2017. Davis stated that after the three of them left the party and were walking down the street, someone called to them. Davis said that he saw a man pointing a gun at him. Davis could not identify Rosendary as that gunman. Davis testified that he and his companions ran away from the gunman, who opened fire. Davis stated that he then drew his gun and returned fire. Davis testified that Appellant and Ebo-Wilson were not involved in the shooting. Davis, Appellant, and Ebo-Wilson got into Appellant's Impala, and Appellant drove them away from the shooter. Davis said he, Appellant, and Ebo-Wilson then abandoned the car and fled on foot after police vehicles blocked their path. Davis claimed his comments on social media were references to the music he listens to. Appellant did not testify.

On November 2, 2018, the jury convicted Appellant of attempted first-degree murder, conspiracy to commit first degree murder, aggravated assault, conspiracy to commit aggravated assault, and PIC.[4]

On January 18, 2019, the trial court sentenced Appellant to concurrent terms of twelve-and-a-half to twenty-five years' imprisonment for attempted murder and conspiracy to commit murder. The trial court imposed no further

_____

[4] The jury also found co-defendant Davis guilty of the same offenses. This Court recently affirmed Davis' judgment of sentence except as to his to sentence for conspiracy to commit murder. **See Commonwealth v. Davis**, 1964 EDA 2019, 2021 WL 4617988, at *12 (Pa. Super. filed Oct. 6, 2021) (unpublished mem.). Davis did not challenge the sufficiency of the evidence on appeal. **Id.**, 2021 WL 4617988, at *3-4.

penalty for Appellant's PIC conviction. The trial court determined that Appellant's aggravated assault conviction merged with his attempted murder conviction and his conspiracy to commit aggravated assault conviction merged with the conspiracy to commit murder conviction.

Appellant filed a timely post-sentence motion arguing that the evidence was insufficient to sustain his convictions for conspiracy to commit murder, attempted murder, and PIC, among other issues. *See* Post-Sentence Mot., 1/28/19, at 3-4 (unpaginated). The trial court denied Appellant's post-sentence motion on June 10, 2019.

Appellant then timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court filed an opinion addressing Appellant's sufficiency of the evidence claims pursuant to Pa.R.A.P. 1925(a). *See* Trial Ct. Op., 10/24/19. This Court docketed that appeal at 1842 EDA 2019. On January 22, 2020, this Court dismissed that appeal because Appellant failed to file a brief.

The trial court explained the subsequent procedural history as follows:

> [On January 24, 2020, t]he [trial] court received [*pro se*] correspondence from [Appellant] addressed to the Clerk of Courts asking whether [Appellant's] trial and appellate counsel, Francis Genovese, Esquire, had filed an appeal for this case. The [trial] court treated this correspondence as [Appellant's] [Post-Conviction Relief Act[5] (PCRA)] petition. On March 4, 2020, the [PCRA] court appointed Matthew Quigg, Esquire to represent [Appellant] and granted [Attorney Quigg] leave to file an amended PCRA petition or [a] *Finley*[fn3] letter. On July 17, 2020, [Appellant, through counsel,] petitioned to reinstate his direct

_____

[5] 42 Pa.C.S. §§ 9541-9546.

appeal rights *nunc pro tunc* pursuant to the Post-Conviction Relief Act. After an evidentiary hearing held on September 14, 2020, [Appellant's] appeal rights were reinstated *nunc pro tunc*. [Appellant] filed a new Notice of Appeal on October 9, 2020. [Appellant] filed a [Rule 1925(b)] concise statement of matters complained of on appeal [challenging the sufficiency of the evidence]. . . .

[fn3] ***Commonwealth v. Finley,*** 550 A.2d 213 (Pa. Super. Ct. 1988) [(*en banc*)].

Trial Ct. Op., 1/4/21, at 1-2 (some citations and footnotes omitted). The trial court's January 4, 2021 opinion adopted the analysis of its October 24, 2019 opinion addressing Appellant's sufficiency of the evidence claims. ***Id.*** at 2.

Appellant raises the following issue for our review:

Did the trial court err in denying Appellant's post-sentence motion for a judgment of acquittal on the charges of attempted murder, criminal conspiracy to commit murder, and possessing an instrument of crime?

Appellant's Brief at 4 (formatting altered).

### Sufficiency of the Evidence

Appellant challenges the sufficiency of the evidence for all of his convictions. ***Id.*** at 7-17. Appellant argues the evidence presented at trial, viewed in the light most favorable to the Commonwealth, "established merely that Appellant was present at the scene of the crime and knew of its commission, which is insufficient to convict him." ***Id.*** at 7. Specifically, Appellant contends there was no evidence that he possessed the specific intent to kill or undertook a substantial step to commit murder, and therefore there was insufficient evidence to sustain his conviction for attempted murder. ***Id.***

at 12-16. Next, Appellant asserts the evidence was insufficient to sustain his conspiracy to commit murder conviction because there was no evidence presented at trial that he had entered into an explicit or tacit agreement to shoot Rosendary. *Id.* at 7-12. Lastly, Appellant claims that because no evidence established that he possessed a firearm, the evidence was insufficient to sustain his conviction for PIC. *Id.* at 16-17.

The Commonwealth responds that Appellant's sufficiency claims are meritless. Commonwealth's Brief at 12-25. Among other reasons, the Commonwealth argues that, at the very least, the evidence established that Appellant acted as a getaway driver for Davis. *Id.* at 12. The Commonwealth contends that by acting as the getaway driver, Appellant can be found guilty as a co-conspirator. *Id.* at 13. The Commonwealth also asserts that Appellant's Rule 1925(b) statement was too vague to preserve his challenges to the sufficiency of the evidence. *Id.* at 25-27. Specifically, the Commonwealth contends that Appellant's Rule 1925(b) statement did "not identify the elements for which the evidence is supposedly insufficient."[6] *Id.* at 27.

---

[6] It is well settled that a vague challenge to the sufficiency of the evidence may result in waiver. *See Commonwealth v. Roche*, 153 A.3d 1063, 1072 (Pa. Super. 2017). Instantly, the trial court addressed Appellant's sufficiency claims in its October 24, 2019 Rule 1925(a) opinion. Therefore, we decline to find waiver. *See Commonwealth v. Laboy*, 936 A.2d 1058, 1060 (Pa. 2007) (*per curiam*).

In reviewing a challenge to the sufficiency of the evidence, our standard of review is as follows:

> Because a determination of evidentiary sufficiency presents a question of law, our standard of review is *de novo* and our scope of review is plenary. In reviewing the sufficiency of the evidence, we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

**Commonwealth v. Palmer**, 192 A.3d 85, 89 (Pa. Super. 2018) (citation omitted), *appeal denied*, 204 A.3d 924 (Pa. 2019).

"Criminal attempt to murder is defined by reading the attempt statute, 18 Pa.C.S. § 901(a), in conjunction with the [first-degree] murder statute, 18 Pa.C.S. § 2502(a)." **Commonwealth v. Predmore**, 199 A.3d 925, 929 (Pa. Super. 2018) (*en banc*) (citation omitted). Therefore, to sustain a conviction for attempted first-degree murder, the Commonwealth must prove that "the defendant had the specific intent to kill and took a substantial step towards that goal." **Id.** (citation omitted); **see also** 18 Pa.C.S. § 901(a) (stating "[a] person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of

that crime"); 18 Pa.C.S. § 2502(a) (stating "[a] criminal homicide constitutes murder of the first degree when it is committed by an intentional killing").

> To prove conspiracy, the trier of fact must find that: 1) the defendant intended to commit or aid in the commission of the criminal act; 2) the defendant entered into an agreement with another to engage in the crime; and 3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime. In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators. In the case of a conspiracy to commit homicide, each member of the conspiracy can be convicted of first-degree murder regardless of who inflicted the fatal wound.

*Commonwealth v. Johnson*, 985 A.2d 915, 920 (Pa. 2009) (citations and quotation marks omitted); *see also Commonwealth v. Barnes*, 871 A.2d 812, 820 (Pa. Super. 2005) (stating "[o]nce the trier of fact finds that there was an agreement and the defendant intentionally entered into the agreement, that defendant may be liable for the overt acts committed in furtherance of the conspiracy regardless of which co-conspirator committed the act" (citation omitted)).

This Court has further explained:

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. An explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities. Thus, a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the

- 10 -

parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation. The conduct of the parties and the circumstances surrounding their conduct may create a web of evidence linking the accused to the alleged conspiracy beyond a reasonable doubt.

*Commonwealth v. Melvin*, 103 A.3d 1, 42-43 (Pa. Super. 2014) (citation omitted).

Furthermore, "[t]he driver of a getaway car can be found guilty as a co-conspirator if it is reasonable to infer that he was aware of the actual perpetrator's intention." *Commonwealth v. Davalos*, 779 A.2d 1190, 1194 (Pa. Super. 2001) (citing *Commonwealth v. Brown*, 505 A.2d 295, 297 (Pa. Super. 1986)).

A person is guilty of PIC if he "possesses an instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). An instrument of crime is defined as "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S. at § 907(d)(2). It is well established "a conviction for possessing an instrument of crime can be sustained even if it is based on circumstantial evidence." *Commonwealth v. Buford*, 101 A.3d 1182, 1189-90 (Pa. Super. 2014) (citing *Commonwealth v. Woodbury*, 477 A.2d 890, 893 (Pa. Super. 1984)).

Specifically, this Court has stated:

The only evidence in support of the accusation of possession was purely circumstantial. However, once the factfinder concluded that the [defendant] was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that [the

- 11 -

defendant] had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. . . . Therefore, [the defendant's] conviction for this offense was grounded upon competent evidence. The evidence brought out during the course of the trial is sufficient to sustain both the conviction for murder in the third degree and the conviction for possession of an instrument of crime.

***Woodbury***, 477 A.2d at 893-94 (citation and footnote omitted).

Section 306 of the Crimes Code defines accomplice liability as follows:

**(a) General rule.—**A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both.

**(b) Conduct of another.—**A person is legally accountable for the conduct of another person when:

(1) acting with the kind of culpability that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct;

(2) he is made accountable for the conduct of such other person by this title or by the law defining the offense; or

(3) he is an accomplice of such other person in the commission of the offense.

**(c) Accomplice defined.—**A person is an accomplice of another person in the commission of an offense if:

(1) with the intent of promoting or facilitating the commission of the offense, he:

(i) solicits such other person to commit it; or

(ii) aids or agrees or attempts to aid such other person in planning or committing it; or

(2) his conduct is expressly declared by law to establish his complicity.

**(d) Culpability of accomplice.**—When causing a particular result is an element of an offense, an accomplice in the conduct causing such result is an accomplice in the commission of that offense, if he acts with the kind of culpability, if any, with respect to that result that is sufficient for the commission of the offense.

\* \* \*

**(g) Prosecution of accomplice only.**—An accomplice may be convicted on proof of the commission of the offense and of his complicity therein, though the person claimed to have committed the offense has not been prosecuted or convicted or has been convicted of a different offense or degree of offense or has an immunity to prosecution or conviction or has been acquitted.

18 Pa.C.S. § 306.

After careful consideration of the record, the parties' arguments, and the trial court's opinion, concerning the sufficiency of the evidence, we affirm on the basis of the trial court's opinion. **See** Trial Ct. Op., 10/24/19, at 16-22. Specifically, we agree with the trial court that there was sufficient evidence, when viewed in the light most favorable to the Commonwealth, to support Appellant's convictions, particularly as a member of the conspiracy such that Appellant can be found criminally liable for the acts of his co-conspirators. **See id.**; **Palmer**, 192 A.3d at 89; **Barnes**, 871 A.2d at 820.

### Legality of Sentence

We also address the legality of Appellant's sentence, which this Court may raise *sua sponte*. **See Commonwealth v. Pi Delta Psi, Inc.**, 211 A.3d 875, 889 (Pa. Super. 2019). Pursuant to 18 Pa.C.S. § 906, "[a] person may not be convicted of more than one inchoate crime of attempt, solicitation, or conspiracy for conduct designed to commit or to culminate in the commission

of the same crime." A Section 906 violation goes to the legality of the sentence. *Commonwealth v. Jacobs*, 39 A.3d 977, 982 (Pa. 2012) (plurality); *see also Commonwealth v. Cooke*, 492 A.2d 63, 70 n.3 (Pa. Super. 1985) (addressing a Section 906 violation *sua sponte*).

> The issue of whether a sentence is illegal is a question of law; therefore, our task is to determine whether the trial court erred as a matter of law and, in doing so, our scope of review is plenary. Additionally, the trial court's application of a statute is a question of law that compels plenary review to determine whether the court committed an error of law.

*Commonwealth v. Williams*, 871 A.2d 254, 262 (Pa. Super. 2005) (citations and quotation marks omitted).

The courts of this Commonwealth have interpreted the term "convicted" as used in Section 906 "to mean the entry of a judgment of sentence, rather than a finding of guilt by the jury." *Jacobs*, 39 A.3d at 983 (citing, *inter alia*, *Commonwealth v. Grekis*, 601 A.2d 1284, 1295 (Pa. Super. 1992)).

In *Commonwealth v. King*, 234 A.3d 549 (Pa. 2020), the defendant argued that Section 906 prohibited the trial court from imposing sentences for both attempted murder and conspiracy to commit murder where the object of those offenses was a single victim. *King*, 234 A.3d at 566-67. Our Supreme Court found "that [the defendant] entered into one agreement with his co-conspirator to murder [the victim] and, because he failed in his attempt to do so, [the defendant] could not be sentenced to serve separate terms for the inchoate crimes of conspiracy and attempt." *Id.* at 568. Our Supreme Court explained that "[b]y enacting Section 906, the General Assembly declared that

- 14 -

where a defendant tries to achieve a result – in this case, murder – but fails to do so, he may only be punished once in the absence of distinct criminal objectives." *Id.* at 572. The *King* Court vacated the defendant's consecutive sentences for attempted murder and conspiracy to commit murder. *Id.*; *see also Cooke*, 492 A.2d at 71-72 (vacating concurrent sentence for conspiracy to commit robbery where defendant had also been sentenced for attempted robbery and the two offenses were designed to commit the same crime).

Here, the trial court imposed concurrent sentences of twelve-and-a-half to twenty-five years' imprisonment for attempted murder and conspiracy to commit murder. However, both crimes had the same object: to kill Kendall Rosendary. Therefore, Appellant's sentence for conspiracy to commit murder is illegal because it violates 18 Pa.C.S. § 906, and it must be vacated. *See King*, 234 A.3d at 572; *Cooke*, 492 A.2d at 71-72.

Because the trial court imposed concurrent sentences, our disposition does not upset the trial court's overall sentencing scheme, therefore we need not remand. *See Commonwealth v. Lomax*, 8 A.3d 1264, 1268-69 (Pa. Super. 2010); *Commonwealth v. Thur*, 906 A.2d 552, 569-70 (Pa. Super. 2006).

For these reasons, we affirm Appellant's convictions, but vacate the sentence for conspiracy to commit murder, and we affirm the judgment of sentence in all other respects.

Judgment of sentence affirmed in part, and vacated in part solely as to the sentence for conspiracy to commit murder.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/19/2021

COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| COMMONWEALTH OF PENNSYLVANIA | : | CP-46-CR-0006906-2017 |
|---|---|---|
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | 1893 EDA 2020 |
| JAMAL ACHILLES JONES | : | |

**OPINION**

HAAZ, J.                                                                                    January 4, 2021

## I. INTRODUCTION

Defendant Jamal Jones appeals from the judgment of sentence imposed on January 18, 2019 and the Order denying his post-sentence motion on June 10, 2019. Defendant's Notice of Appeal, 10/9/20. Defendant was sentenced to twelve and one-half (12 ½) to twenty-five (25) years imprisonment for attempted murder and a concurrent sentence of twelve and one-half (12 ½) to twenty-five (25) years for conspiracy to commit murder. Defendant's conviction for aggravated assault merged with his attempted murder conviction and his conviction for conspiracy to commit aggravated assault merged with his conspiracy to commit murder conviction. No further penalty was imposed for the possession of an instrument of a crime conviction.

## II. PROCEDURAL HISTORY

Defendant originally filed a Notice of Appeal on June 25, 2019 from the Order denying his post-sentence motion. The trial court opinion was filed of record on October 24, 2019. The Superior Court of Pennsylvania dismissed Defendant's direct appeal for failure to file a brief on January 22, 2020.[1] The court received correspondence from Defendant addressed to the Clerk of Courts asking whether Defendant's trial and appellate counsel, Francis Genovese, Esquire, had

---

[1] The Superior Court's Order was filed of record in the trial court docket on March 5, 2020.

filed an appeal for this case.[2] The court treated this correspondence as Defendant's PCRA petition. On March 4, 2020, the court appointed Matthew Quigg, Esquire to represent Defendant and granted leave to file an amended PCRA petition or *Finley*[3] letter. On July 17, 2020, Defendant petitioned to reinstate his direct appeal rights *nunc pro tunc* pursuant to the Post-Conviction Relief Act. After an evidentiary hearing held on September 14, 2020, Defendant's appeal rights were reinstated *nunc pro tunc*. Order, 9/14/20. Defendant filed a new Notice of Appeal on October 9, 2020. Defendant filed a concise statement of matters complained of on appeal raising the following issue:

> 1. Did the Trial Court err in denying Appellant's Post-Sentence Motion for a Judgment of Acquittal on the charges of attempted murder, criminal conspiracy to commit murder, and possessing an instrument of crime?

Concise Statement, 11/3/20. Defendant raised the same issue in his original concise statement. Concise Statement, 7/30/19. Therefore, the court refers to its October 24, 2019 opinion, attached hereto, for discussion of the issue raised on appeal.

BY THE COURT:

_____
RICHARD P. HAAZ,        J.

Copies sent by e-mail on 1/4/21 to:
Robert Falin, Esquire
Kevin Steele, Esquire
Matthew Quigg, Esquire
Clerk of Courts

_____
Secretary

---

[2] The correspondence addressed to the Clerk of Courts was dated January 16, 2020 and was filed of record on January 24, 2020.
[3] *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. Ct. 1988).

2

COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-46-CR-0006906-2017

               : 

v.                    : 

               : 

               :     1842 EDA 2019

JAMAL ACHILLES JONES         : 

## OPINION

HAAZ, J.                                  October 23, 2019

## INTRODUCTION

This case arose from the shooting of Kendall Rosendary on August 8, 2017 in Norristown, Pennsylvania. Defendant Jones and co-defendant Jahleel Davis were arrested shortly after the shooting. Criminal complaints were filed against co-defendants Jones and Davis charging them with attempted murder and related crimes on August 10, 2017.

On January 17, 2018, the Jones prosecution was consolidated, on motion of the Commonwealth, with *Commonwealth v. Jahleel Davis,* Docket No. CP-46-CR-0006720-2017. On December 21, 2017, Defendant Davis filed an omnibus pre-trial motion that included a motion to suppress evidence pertaining to the prosecution against him only. Evidentiary hearings were held on Davis' motion on October 3, 2018 and October 16, 2018. The motion was denied by memorandum and order dated October 26, 2018.

A jury trial commenced on October 26, 2018. On November 2, 2018, Defendant Jones was convicted by a jury of attempted murder, conspiracy to commit attempted murder, aggravated assault, conspiracy to commit aggravated assault and possession of an instrument of a crime. On January 18, 2019, Defendant was sentenced to twelve and one-half (12 ½) to twenty-five (25) years imprisonment for the attempted murder conviction and a concurrent sentence of

1

twelve and one-half (12 ½) to twenty-five (25) years for the conspiracy to commit murder conviction. Defendant's conviction for aggravated assault merged with his attempted murder conviction and his conviction for conspiracy to commit aggravated assault merged with his conspiracy to commit murder conviction. No further penalty was imposed for the possession of an instrument of a crime conviction. Defendant appeals from his judgment of sentence.

On January 28, 2019, Defendant filed post-sentence motions for a judgment of acquittal, reconsideration of his sentence and a new trial. The court held evidentiary hearings on these motions on May 10, 2019 and June 3, 2019. The court denied Defendant's post-sentence motions on June 10, 2019.

On June 25, 2019, Defendant filed a notice of appeal to the Superior Court. On June 26, 2019, the court ordered defendant to file a concise statement of errors complained of on appeal within twenty-one (21) days pursuant to Pa.R.A.P. 1925(b). On July 30, 2019, Defendant filed the following concise statement of errors complained of on appeal:

1. Did the Trial Court err by Denying Defendant's Post-Sentence Motion for a Judgment of Acquittal on the charges of Criminal Attempt at Murder, Criminal Conspiracy to Commit Murder and possessing an Inst[r]ument of Crime[,] for which the Jury returned a guilty verdict?

**EVIDENCE AT TRIAL**

The shooting which occurred in this case was part of the aftermath of shootings which occurred between rival groups of young men in Pottstown and Norristown. Lieutenant Kenneth Lawless of the Norristown Police Department was involved in the investigation of shootings that occurred in Norristown in the summer of 2017 when Jordan Scott was murdered and Taye Wynder was shot and injured. T2 139-140. Lt. Lawless testified that there were a series of shootings in Norristown and Pottstown that were believed to be part of an ongoing Norristown

2

versus Pottstown feud. T5 1083-1085. Kendall Rosendary, the victim in this case, was an innocent bystander in what was intended to be the shooting of a member of the rival Norristown group in retaliation for the murder of Jordan Scott, a member of the Pottstown group.

Detective William Mitchell, Jr. was a detective with the Montgomery County District Attorney's Office at the time of the subject events. T4 765. Detective Mitchell was involved in the investigation surrounding the murder of Jordan Scott, also known as "Bud," which occurred on July 6, 2017. *Ibid.* At that time, Jordan Scott was residing with Taye Wynder in Pottstown. T4 765-766. William Wilson and Isaiah Freeman were from Norristown. T4 766-767. Both were convicted of the murder of Jordan Scott. T4 766. Freeman was convicted of first-degree murder and Wilson was convicted of third-degree murder. T4 769.

Corporal Brian Graham was a police officer with the Norristown Police Department at the time of the subject events. T3 435. On August 8, 2017, at approximately 11:00 p.m., Corporal Graham was patrolling in Norristown in the 500 and 600 block of Cherry Street when he received a report of a possible disturbance by a caller who identified herself as Chris Williams. *Ibid.* Based on Ms. Williams' information, Corporal Graham sent out a dispatch about individuals from Pottstown possibly being in Norristown to retaliate. T3 436.

Lt. Lawless and other officers were dispatched to the area of the 500, 600 and 700 blocks of Cherry Street in Norristown, Montgomery County shortly after 11:00 p.m. on August 8, 2017. T2 157-158. At approximately 11:33 p.m., while on the 600 block of Cherry Street, Lt. Lawless heard what he thought were fireworks. T2 158-159. After exiting his car at 719 Cherry Street, a bullet went through the trees just above his head and he realized he was hearing gunshots. *Ibid.* He returned to his vehicle and saw a silver Chevy Impala "further up on the next block leaving the scene at a high rate of speed." T2 159.

3

Lt. Lawless notified other officers that the fleeing vehicle was travelling north on Cherry Street as he kept sight of the vehicle. T2 161. Officer Jason Hoover turned his vehicle from Elm Street onto Cherry Street to block the path of the fleeing vehicle. *Ibid.* Lt. Lawless drove toward the Impala. T2 161-162. He approached the blocked vehicle and saw three occupants of the Impala abandon the vehicle and flee on foot. T2 162-163. The occupants appeared to be African-American and were wearing dark hoodies, one of which had an Adidas emblem. T2 164. The occupants hopped a fence and ran through the backyards of nearby houses. T2 162. Police then set up a perimeter to prevent the suspects from escaping the area. T2 164-165.

Officer Hoover was in his vehicle on Swede Street near its intersection with Oak Street when he heard gun shots. T3 319-321. Officer Hoover drove up Swede Street where it intersected with Elm Street and turned left. T3 322. Lt. Lawless informed Officer Hoover by radio that a silver Chevy sedan was pulling out of the area and travelling at a high rate of speed north on Cherry Street. *Ibid.* Officer Hoover turned down Cherry Street to block the sliver Chevy from leaving the area. *Ibid.* He observed three individuals get out of the Chevy and run from the vehicle. T3 323. Two of the fleeing individuals were wearing dark-colored clothing, one with a black hooded sweatshirt with a white Adidas logo on it. T3 324. The third individual was wearing lighter-colored clothing with a grayish top. *Ibid.*

Lt. Lawless and other officers established a perimeter and continued pursuit of the suspects while Officer Hoover remained behind and secured the abandoned vehicle. T3 334. The front passenger door of the abandoned vehicle was still open and the passenger's side of the car had bullet holes in it. *Ibid.* Located in the back seat of the vehicle in plain view was a black revolver. *Ibid.* The revolver was a .38 Special caliber that contained fired cartridge casings in its cylinder. T4 784. Officer Hoover located a magazine for a .40 caliber Glock pistol in the lower

4

pocket of the front passenger door. T3 334-335. Officer Hoover recovered a small black cell phone on the outside of the driver's side door. T3 336.

Officer Jeffrey Portock was with the Pottstown Police Department and the Montgomery County SWAT West team at the time of the subject events. T3 424. Officer Portock was attached to the K9 Unit and had a canine partner with specialized training to search and track the suspects. T3 424-425. Officer Portock was on patrol in Pottstown when he received a dispatch to Norristown for a canine assist. T3 425. Officer Portock and his canine partner tracked the fleeing individuals using the scents from the abandoned Chevy Impala. T3 427-433. With the assistance of his canine partner, Officer Portock located Defendant Jones and Taron Ebo-Wilson[1] hiding underneath the back porch of a house at 837 Swede Street in Norristown in the early morning hours of August 9, 2017. T2 170-71; T3 427-433; 425.

Defendant Jones was discovered together with Taron Ebo-Wilson underneath the back porch of the house located at 837 Swede Street. T2 169; 170-171. Ebo-Wilson was wearing a gray sweatshirt. T3 389. Lt. Lawless performed a pat down search of Defendant Jones and found the key to the abandoned Impala. T2 171-172. Defendant Jones told Lt. Lawless it was the key to his Impala. T2 171. This key was matched to the Chevy Impala that had been abandoned on Cherry Street. T2 171-172. A firearm was also recovered in the immediate area where Defendant Jones and Taron Ebo-Wilson were hiding. T2 181. The firearm was a .40 caliber Glock Model 27. T3 359.

Corporal Brian Graham located Defendant Davis in the backyard of 844 Cherry Street in the early morning hours of August 9, 2017. T2 173; T3 435-36; T3 440. Lt. Lawless testified

---

[1] Taron Ebo-Wilson was the third person in the Impala vehicle with Davis and Defendant and fled with Defendant. He pled guilty to attempted murder and conspiracy to commit murder on October 12, 2018 arising from the Rosendary shooting. *Commonwealth v. Ebo-Wilson*, Docket No. CP-46-CR-0006721-2017. He was sentenced to undergo imprisonment for not less than 8 years nor more than 20 years in state prison pursuant to the negotiated plea agreement.

5

that Davis was found next to a black hooded sweatshirt with an Adidas emblem on it. T2 173; Ex. C-145a. A camouflage-printed mask was also recovered in the immediate area of Defendant Davis. T2 179-180; T3 442-443. During the investigation the following day detectives discovered a .45 caliber handgun in a bucket near where Defendant Davis was found. T3 581-582. The gun had eight live rounds of ammunition in it. T4 658-659.

Officer Joshua Keenan of the Norristown Police Department was at the intersection of Marshall and Cherry Streets in Norristown when he heard gunshots. T3 384. He received information that an individual had been shot on Cherry Street and proceeded to that location to render aid. T3 385. Upon encountering the victim of the shooting, Kendall Rosendary, Officer Keenan observed that he had "multiple pentrating traumatic injuries to both his upper and lower extremities" and he was "bleeding profusely." T3 385-387. Officer Keenan stated he had never seen someone lose so much blood and survive. T3 387-388. No firearm or ammunition was recovered from Rosendary. T3 437.

Lt. Lawless stayed at the site of the shooting on the 800 block of Cherry Street after Mr. Rosendary was transported to a hospital for treatment. T2 166. He observed blood stains on the sidewalk and multiple shell casings in the street. *Ibid.* There also appeared to be several strike marks on the sidewalk where the sidewalk had been struck by bullets. T2 176-177. Several bullets were later extracted from strike marks in nearby fences. T2 215. Corporal Graham estimated that fired cartridge casings were located approximately five (5) to ten (10) feet from where Rosendary had collapsed on the sidewalk from his injuries. T3 439.

Kendall Rosendary was twenty-six (26) years old at the time of the shooting. T2 219. He testified that he was shot fifteen times on August 8, 2017.[2] T2 219-220. Rosendary was shot

---

[2] The parties stipulated that the victim was treated at Penn Presbyterian Hospital from August 9, 2017 to September 13, 2017 where he was treated for 13 gunshot wounds, seven of which were entry wounds. It was further stipulated

while walking on Cherry Street near the location of a playground and park at the intersection of Cherry and Oak Streets. T2 220. Rosendary heard people yelling at him and he tried to look back. T2 221. He saw a gun, tried to run and then realized he had been shot. T2 257. Rosendary could not identify who shot him. T2 221. He continued to get shot after he fell to the ground. T2 222. Rosendary stated that he was not armed and did not fire a gun at any point. T2 224.

Rosendary was transported to Penn Presbyterian Hospital where he underwent numerous surgeries before he was discharged the next month to a rehabilitation facility. T2 224-225; T5 1005. He then spent several more months at the rehabilitation facility. T2 225-226. Rosendary was still having regular appointments for medical treatment approximately once every other month at the time of trial and will likely require additional surgeries. T2 247. Rosendary stated that he suffered from guns-shot wounds in almost every major area of his body. T2 226. As a result of the injuries he suffered on August 8, 2017, he can longer run or perform regular exercise, and must use a colostomy bag. T2 227.

Rosendary was intubated while he was a patient at Penn Presbyterian Hospital. T2 228. On August 14, 2017, after the intubation tube was removed from Rosendary's throat, he gave a statement to Detectives David Mazza and Greg Henry while still in the hospital. T2 228-229. Detective Greg Henry provided a summary of Rosendary's statement that Rosendary heard one of the males call him a "bitch." T2 228-233. According to their summary, he told detectives he saw three unknown males approach him and start shooting. T2 231-232. At trial, he recalled thinking that it was actually more than three individuals. T2 232-233. He told detectives the individuals shot him several more times as he was lying on the ground. T2 233. He stated the individuals were black males, in their mid to late teens, and that they were all armed with

that the victim had multiple surgeries over the course of his commitment at the hospital and suffered serious bodily injury. T5 1005.

7

handguns. T2 234. The detectives' summary stated that Rosendary told them that two of the shooters were wearing dark hooded sweatshirts, though Rosendary could not recall telling that to detectives. *Ibid.*

On September 7, 2017, Rosendary gave a second statement to Detective Mazza and Detective Steven Sowell. T2 235-237. Rosendary told detectives that on August 8, 2017, on the 800 block of Cherry Street, three men got out of a light-colored car and all three had guns and shot him. T2 239-240. He said he was shot in his shoulder, stomach, arm, both thighs, hip, knee, butt and foot. T2 241.

Rosendary told detectives that the shooters were young black males. T2 241-242. He described the car that they were in as "light, like tan." T2 242. He said that he did not know why they shot him and that he did not know them. *Ibid.* While in the hospital, Rosendary provided police with a DNA sample. T2 246.

Detective Dirk Boughter was with the Montgomery County Detective Bureau in the Major Crimes Unit at the time of the subject events. T3 510-511. The parties stipulated that Detective Boughter qualified as an "expert in crime scene analysis." T3 511. Detective Boughter was called to analyze the crime scene during the early morning hours of August 9, 2017. T3 513.

Detective Boughter testified that nine 9 millimeter fired cartridge casings, nine .40 caliber fired cartridge casings and five .45 caliber fired cartridge casings were recovered from the crime scene. T3 530. Five bullet fragments were also recovered from the crime scene. T3 531. The .40 caliber cartridge casings matched the Glock 27 located near Defendant Jones and Ebo-Wilson when they were apprehended. T4 665. However, detectives later learned that the .45 caliber handgun recovered near Defendant Davis in the backyard of 844 Cherry Street was not

8

the firearm that had fired the .45 caliber fired cartridge casings discovered at the scene of the shooting. T3 582.

During his investigation, Detective Boughter discovered two strike marks on a white Mazda SUV parked on the west side of Cherry Street just north of where the victim was shot. T3 538-540. There was also a bullet fragment between the Mazda's front wheel and the curb "as if it had exited out of the hood and down." *Ibid.* There were strike marks and a recovered bullet fragment on the fence post of the playground behind the area where the victim was found. T3 545; 548. No strike marks, indicative of return fire, were discovered on the opposite side of the street. T3 569-570. There were also three strike marks observed on the passenger side of the Chevy Impala. T3 571.

As part of his investigation, Detective Boughter collected twenty-three (23) fired cartridge casings from the scene as well as multiple bullet fragments. T3 514-515. He testified that the pattern of fired cartridge casings was consistent with how semi-automatic weapons expel cartridge casings to the side of the weapon. T3 524-525; 529. Detective Boughter testified that the pattern of the fired cartridge casings was consistent with the shooter having been in motion while firing, specifically towards the direction of the victim and his direction of travel as evidenced by the blood trail on the sidewalk. T3 565-569; T3 436-437. The fired cartridge casings were inconsistent with having been fired or emptied from a revolver. T3 525.

Detective Boughter performed DNA swabs on the recovered firearms. T4 650-651. DNA swabs were also performed on the .38 caliber revolver recovered from the Chevy Impala. T5 986. The parties stipulated that the DNA swabs taken from the trigger of the .40 caliber Glock 27 found near Defendant Jones and Ebo-Wilson contained a mixture from at least two individuals and that it was greater than one million (1,000,000) times more likely that Taron Ebo-Wilson

9

was one of those individuals. T5 983-987; Ex. C-162; C-164. Further, the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of Jones' Chevy Impala contained a mixture from at least three individuals and was nineteen thousand six hundred sixty (19,660) times more likely that Defendant Davis was one of those individuals. *Ibid.*

Detective Eric Nelson was a detective with the Montgomery County Detective Bureau at the time of the subject events. T4 771. Detective Nelson was qualified to offer expert opinions in the field of forensic firearms identification and analysis. T4 774. Detective Nelson testified that some of the bullets and bullet fragments recovered at the crime scene had microscopic characteristics that were consistent with having been fired from a .40 caliber Glock 27 like the one recovered near Ebo-Wilson and Defendant Jones. T4 795-797. Other bullets and bullet fragments that were recovered were consistent with having been fired from a .38 Special caliber revolver like the one recovered in the back of the Chevy Impala. T4 800-801.

Detective Edward Schikel of the Montgomery County Detective Bureau was qualified to offer expert opinions in the field of forensic crime scene analysis. T4 687. Detective Schikel testified that the pattern of fired cartridge casings and strike marks observed at the crime scene was consistent with shots being fired from the street in the direction of the sidewalk where the victim was found. T4 699-700. He also observed strike marks on the passenger's side of the Chevy Impala. T4 703-704.

Detective Schikel executed a search warrant for the Chevy Impala. T4 702; Ex. C-139. Detective Schikel found identifications of Taron Ebo-Wilson and an individual named Clay Jones within the vehicle. T4 707-708. Detective Schikel discovered several live .45 caliber rounds as well as a .40 caliber magazine for a Glock pistol inside the vehicle. T4 715-716; 718. A halloween mask was also recovered from inside the vehicle. T4 706.

10

Albert Lattanzi worked on this case as a forensic scientist with the Pennsylvania State Police in the Harrisburg Regional Crime Lab. T3 401-402. He was qualified as an expert in the field of forensic testing for gunshot and gunpowder residue. T3 404. Mr. Lattanzi performed gunshot residue and gunpowder testing on samples collected from the black Adidas sweatshirt found near Defendant Davis at the time of Davis' apprehension. T3 403; T3 410-411; T3 442. Mr. Lattanzi testified to the presence of gunshot residue on the black Adidas sweatshirt, consistent with firing a gun. T3 413-416.

Officer Andrew Licwinko was a police officer with the Pottstown Police Department at the time of the subject events. T5 912-913. Officer Licwinko testified that he had previously observed Defendant Davis and Defendant Jones in the Pottstown area. T5 923; 928. In particular, he had seen them associating with Ahbayah Davila and other individuals who referred to themselves as members of a group known as ATM. T5 923; 928. He testified that this group changed its name to BGB, which stood for "Bud Gang Bitches," after the murder of Jordan Scott. T5 923-924; 1046. Officer Licwinko personally observed some of the individuals with whom Defendant Davis associated posting their membership in the group on social media. *Ibid.* Others had "BGB" tattooed on their bodies. *Ibid.* He saw Defendant Jones at the preliminary hearing of Ahbayah Davila on an unrelated matter. T5 925.

Detective Gregory Henry was a detective with the Montgomery County Detective Bureau at the time of the subject events. T5 1006. Detective Henry reviewed the cell phone extractions from the phones recovered outside the driver's side door of the Chevy Impala as well as in the center console of the Chevy Impala. T5 1013-14. He also reviewed the Facebook accounts of Jamal Jones and Leel Stacks.[3] T5 1014. On Defendant Davis' Facebook account under the

---

[3] Defendant Davis was saved in Defendant Jones' contacts as "Leel," and Defendant Jones was saved in Defendant Davis' phone as "Mal." T5 1017-1018.

11

name "Leel Stacks," there were several images that identified him as being a member of BGB. T5 1043. The cell phone found outside the Chevy Impala contained photos and videos of Defendant Jones, indicating the cell phone belonged to him. T5 1014. In addition, a phone number associated with that cell phone was the same phone number that Defendant Jones provided police upon his arrest. T5 1014-1015.

Detective Henry reviewed the extraction from a third cell phone, an LG phone, that was physically removed from Defendant Davis upon his arrest. T5 1015. The number associated with this phone was nearly the same as the one Defendant Davis provided with some of the numbers transposed in a slightly different order. T5 1016. This phone appeared to be linked to the Leel Stacks Facebook account. *Ibid.* There were several calls between Defendant Jones' and Defendant Davis' phones, the last call being on the date of the shooting around 9:00 p.m. T5 1017.

The cell phones contained numerous videos and images that depicted Jones and Davis in possession of firearms. T5 1020-1030; 1033-1038. Some of these included images of firearms that matched the caliber of fired cartridge casings recovered at the scene of the Rosendary shooting. 1067-1073. Some of these images were dated shortly before the shooting and at least one appeared to have been taken the same day. T5 1025-1026; 1032-1033. In one video extracted from Defendant Davis' phone, Defendant Davis identifies himself as being part of BGB and repeatedly says "gang gang" while another individual is waving a gun at the camera. T5 1029-1030. Images from Defendant Davis' phone, time stamped August 7, 2017, the day before the shooting, showed multiple firearms on a person's lap. T5 1024-1026. One of the images from Defendant Davis' phone, time stamped on the date of the shooting, showed a revolver that resembled the revolver that was recovered from the backseat of Defendant Jones'

12

Impala. T5 1033; 1079. With respect to Defendant Jones' phone, there were a series of photographs showing firearms on an individual's lap, one of them including an extended magazine. T5 1033-35. Other images showed Defendant Jones with Ebo-Wilson. T5 1035. One video retrieved from Defendant Jones' phone appears to be taken in Defendant Jones' Impala, showing Ebo-Wilson and Defendant Jones, who referenced the word "gang." T5 1036-1037.

There were a number of Facebook posts mourning the death of Jordan Scott. T5 1044-1045. One of Defendant Davis' posts, created on July 7, 2017, the day after Jordan Scott was murdered, expressed a desire to get revenge for Scott's death. *Ibid*. A post on Jordan Scott's Facebook page from Defendant Davis states "Death is never a option or planned but revenge is." *Ibid*. Two days later, Defendant Davis posted "RS, Bud gone, so the love is gone ...its war now." T5 1048. On July 18, 2017, Defendant Davis posted "Losing Bud turned me to a monster. The thought of losing another made me grind harder." T5 1047. On August 7, 2017, the day before Rosendary was shot, Defendant Davis and one "BGB Tone" message each other through Facebook. T5 1145-1147. BGB Tone writes to Defendant Davis saying "Niggas who kill Bud, his people" and Defendant Davis responds "Yeah, nigga wanna beef, grab bigger guns." T5 1146-47.

Felicia Mickie was a Montgomery County Juvenile Probation Officer who was supervising Defendant Davis in the summer of 2016. T3 492. During her supervision of Defendant Davis, she learned that he associated with a group known as "ATM." T3 492-493. She also had personal knowledge of other individuals who identified themselves as members of ATM, which stood for "Addicted to Money." T3 493; 508. Defendant Davis and the other members of this group were all from Pottstown. T3 494. Officer Mickie stated ATM changed

13

its name to BGB after the murder of Jordan Scott. *Ibid.* Officer Mickie had no knowledge of Defendant Jones and whether he was a member of this group. T3 508-509.

Pursuant to her supervision, she obtained possession of Defendant Davis' cell phone. T3 493. Defendant Davis' messages were to and from individuals identified as members or associates of ATM. T3 503. Defendant Davis' Facebook messages with Nathaniel Howard, also known as Coke Boy Montana, stated "Get the drop. We can both slide. You know how I rock. Mask up. Let's do it right." T3 503-505. Howard's response stated "When they mask up, they coming for you[r] ice. When they bare face, they coming for your life." T3 505-506. Defendant Davis responded, in part, by stating he had been "itching to catch another body." T3 506.

Defendant Davis testified at trial. T5 1088-1165. He testified that he was in Norristown on August 8, 2017 to meet a girl named Bree. T5 1089. After searching for Bree unsuccessfully, Defendant Davis ran into Defendant Jones and Taron Ebo-Wilson. T5 1090. They attended a nearby party where they got into a confrontation after Defendant Davis said he was from Pottstown. T5 1091. All three decided to leave the party. *Ibid.* Defendant Jones walked away first, and Defendant Davis and Ebo-Wilson followed. T5 1098. Defendant Jones' car was their means of transportation out of Norristown. *Ibid.*

After walking down the street for a few minutes, they noticed a group of people congregating and coming down the street toward them. T5 1091-1092. They continued to walk down the street, feeling nervous and scared, considering their prior confrontation at the party. T5 1092. Defendant Davis testified as follows: "And when we walked, somebody said, 'Yo.' And when we turned around, in the motion of us turning around, we seen somebody raising their gun." *Ibid.* He was unable to identify the person with the gun as Rosendary. T5 1120. Defendant Davis started running. T5 1092; 1099-1100. After taking two or three steps, he heard

14

a gunshot. T5 1099-1100. After a pause, Defendant Davis removed a gun tucked underneath his jacket near his hip and began shooting in the direction he heard gunfire. T5 1092; 1100.

Defendant Davis proceeded to run and shoot back at the same time. T5 1092. Defendant Davis felt a bullet whiz past him while he ducked his head and continued shooting. *Ibid.* Defendant Davis, Jones, and Ebo-Wilson reached Defendant Jones' car and Jones drove them away from the shooting scene. T5 1092-1093. Police vehicles cut them off and they all abandoned Jones' car and fled on foot. T5 1093. Defendant Davis explained that he ran because he was just involved in a shooting, had a gun on him, and was afraid of being arrested. *Ibid.* Defendant Davis initially gave the police a different account of the events that transpired that night, acknowledging that he earlier lied to the police. T5 1102-1103. He earlier told police he had nothing to do with the shootings, even though he admitted at trial he shot a firearm multiple times. T5 1127-1128. Defendant Davis said that he did not recognize Rosendary in the courtroom, and did not know who he was when firing towards him. T5 1103-04. He had seen Rosendary in jail a few times, but never knew who he was. T5 1104.

Defendant Davis explained the Norristown versus Pottstown feud. T5 1104-1107. The feud involved two individuals, one of them being Jordan Scott, fighting over a female whom Defendant Davis did not personally know. T5 1105-1106. He testified Jordan Scott was not his only good friend who died that summer. T5 1104-1105. He testified that he was the only one with a connection to Jordan Scott and Defendant Jones did not know Jordan Scott to his knowledge. T5 1107. Defendant Davis further testified he believed that neither Defendant Jones nor Taron Ebo-Wilson had a history involving illegal firearms, unlike himself. T5 1109-1110. He testified his inflammatory remarks with respect to his conversation with BGB Tone and his

15

statements about "masking up" referenced music he listens to. T5 1108-1109. Defendant Jones did not testify at trial.

## LEGAL ANALYSIS

"A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a conviction on a particular charge, and is granted only in cases in which the Commonwealth has failed to carry its burden regarding that charge." *Commonwealth v. Fitzpatrick*, 159 A.3d 562, 567 (Pa. Super. 2017) (quoting *Commonwealth v. Hutchinson*, 947 A.2d 800, 805-806 (Pa. Super. 2008). The Commonwealth's burden is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt . . . Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that a as a matter of law no probability of fact may be drawn from the combined circumstances.

*Id.* The Commonwealth may rely on wholly circumstantial evidence to prove each element of the offense. *Id.*

### 1. Conspiracy to Commit Murder

"To sustain a conviction for criminal conspiracy, the Commonwealth must establish the defendant: 1) entered into an agreement to commit or aid in an unlawful act with another person or persons; 2) with a shared criminal intent; and 3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Devine*, 26 A.3d 1139, 1147 (Pa. Super. 2011) (quoting *Commonwealth v. Jones*, 874 A.2d 108, 121 (Pa. Super. 2005)). The agreement to commit a criminal act need not be supported by an "explicit or formal agreement." *Commonwealth v. Johnson*, 719 A.2d 778, 785 (Pa. Super. 1998) (quoting *Commonwealth v. Kennedy*, 453 A.2d 927, 929-30 (Pa. 1982)). Rather, "[a]n agreement can be inferred from a variety of circumstances

16

including, but not limited to, the relation between the parties, knowledge of and participation in the crime, and the circumstances and conduct of the parties surrounding the criminal episode." *Devine*, 26 A.3d at 1147 (quoting *Jones*, 874 A.2d at 121-22); *See also Commonwealth v. Hennigan*, 753 A.2d 245, 253 (Pa. Super. 2000) ("Proof of conspiracy is almost always extracted from circumstantial evidence.").

The evidence at trial established that Defendant Jones drove Davis and Ebo-Wilson from the scene of the shooting on August 8. 2017. Facebook posts, Facebook messages, videos, and images obtained from co-defendant Davis' cell phone included messages that Davis was seeking revenge for Jordan Scott's murder by the rival Norristown group and that he was "itching to catch another body." T3 506. The videos and images also depicted Jones and Davis in possession of illegal firearms, at least one of which resembled the revolver used to shoot Kendall Rosendary.

Defendant Jones was found with the keys to his Impala when he was captured after the shooting. Defendant Davis testified that the three individuals were relying on Defendant's Impala as their means of leaving Norristown that night. A .38 Special caliber firearm with fired cartridge casings in its cylinder was located in Jones' vehicle after the shooting. A .40 caliber Glock pistol magazine and live .45 caliber rounds were also located in Jones' vehicle after the shooting. A ballistics expert testified that bullets and bullet fragments recovered at the crime scene were consistent with having been fired from a .40 caliber Glock 27 like the one recovered near Defendant Jones and Ebo-Wilson when the two men were found after the shooting. Additionally, bullets and bullet fragments recovered from the scene were consistent with having been fired from a .38 caliber revolver like the one recovered in the back of Jones' Chevy Impala.

17

The evidence at trial supported the jury's verdict that Jones entered into an agreement with Davis and Ebo-Wilson to drive to Norristown and shoot a person in retaliation for the Jordan Scott killing. There were several phone calls back and forth between Defendant Jones and Davis, including one on the night of the shooting. Jones drove the fleeing perpetrators from the shooting scene to evade apprehension. "[T]he driver of a 'get away' car can be found guilty as [a co-conspirator] if it reasonable to infer that he was aware of the actual perpetrator's intention." *See Commonwealth v. Brown*, 505 A.2d 295, 297 (Pa. Super. 1986) (alteration in original) (quoting *Commonwealth v. Wright*, 344 A.2d 512, 515 (Pa. Super. 1975)) (finding sufficient evidence for a conspiracy to commit theft where appellant drove co-conspirator from victim's home); *See also Commonwealth v. Davalos*, 779 A.2d 1190, 1193-94 (Pa. Super. 2001) (upholding criminal conspiracy conviction where appellant drove co-conspirator to and from scene of shooting, was present during the shooting, and fled from police). *See Commonwealth v. Marquez*, 980 A.2d 145, 150 (Pa. Super. 2009) ("This Court has repeatedly held that flight, along with circumstantial evidence, supports the inference of criminal conspiracy.").

An "overt act need not be committed by the defendant; it need only be committed by a co-conspirator." *Johnson*, 719 A.2d at 784. Defendant Davis admitted to shooting the victim multiple times. Defendant Jones is liable for the acts of his co-conspirators. *See Hennigan*, 753 A.2d at 254 (sustaining appellant's conspiracy conviction where co-conspirator's overt act of selling crack cocaine to an undercover officer was imputed to appellant). As will be discussed in the next section, the evidence clearly established that Defendant Davis attempted to commit murder.

18

### 2. Attempted Murder

"A person commits an attempt when, with intent to commit a specific crime, he does any act which constitutes a substantial step toward the commission of that crime." 18 Pa. C.S. § 901(a). For an attempted murder, the Commonwealth must prove the defendant's "specific intent to kill." *Commonwealth v. Tucker*, 143 A.3d 955, 964 (Pa. Super. 2016) (quoting *Commonwealth v. Geathers*, 847 A.2d 730, 734 (Pa. Super. 2004)). "[I]f a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder." *Id.* (quoting *In re R.D.*, 44 A.3d 657, 678 (Pa. Super. 2012)). Furthermore, it is well established by the Supreme Court of Pennsylvania "that '[t]he use of a deadly weapon on a vital part of the body is sufficient to establish the specific intent to kill.'" *Id.* (quoting *Commonwealth v. Rega*, 933 A.2d 997, 1009 (Pa. 2007)); *See Commonwealth v. Montalvo*, 956 A.2d 926, 932 (Pa. 2008) ("Specific intent to kill can be established through circumstantial evidence . . .").

DNA testing established the extremely high likelihood of the culpability of Jones, Ebo-Wilson and Davis. The parties stipulated that that the DNA swabs taken from the trigger of the .40 caliber Glock 27 found near Defendant Jones and Ebo-Wilson contained a mixture from at least two individuals and that it was greater than one million (1,000,000) times more likely that Ebo-Wilson was one of those individuals. Further, the DNA swabs taken from the grip of the .38 Special caliber revolver found in the back of Jones' Impala contained a mixture from at least three individuals and that it was nineteen thousand six hundred sixty (19,660) times more likely that Defendant Davis was one of those individuals. The recovery of the firearms, shell casings, and DNA evidence established that Ebo-Wilson and Davis possessed firearms which were used to shoot Kendall Rosendary multiple times.

19

Evidence of Davis' Facebook posts and messages seeking revenge for Jordan Scott's death provided further evidence of Defendant Davis' specific intent to kill. *See Commonwealth v. Cross*, 331 A.2d 813, 814-15 (Pa. Super. 1974) (finding that evidence of defendant's "long standing feud" with victim's relative and verbal statement to victim prior to shooting was sufficient to establish intent); *See also Commonwealth v. Predmore*, 199 A.3d 925, 932 (Pa. Super. 2018). Here, the Commonwealth provided compelling evidence regarding Defendant Davis' specific intent to seek revenge for Jordan Scott's murder. After Scott's death, Defendant Davis wrote a series of posts on Scott's Facebook page stating revenge is planned, declaring war, and calling himself a monster. The day after Scott's death, Davis posted "Death is never a option or planned but revenge is." T5 1044-1045. Two days later, Davis also posted "RS, Bud gone, so the love is gone...its war now." T5 1048. The day before the Rosendary shooting, Davis messaged another BGB member stating "Yeah, nigga wanna beef, grab bigger guns." T5 1146-47. Davis' Facebook postings and messages provided persuasive evidence of his intent to seek revenge for his friend's death. *See Commonwealth v. Donton*, 654 A.2d 580, 585 (Pa. Super. 1995) (finding intent where appellant expressed his desire to kill his estranged wife for leaving him through statements made to his son and letters written to parents describing his motive). Moreover, "where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt." *Commonwealth v. Johnson*, 910 A. 2d 60, 65-66 (Pa. Super. 2006) (finding that trial court did not abuse its discretion in admitting evidence of defendant's flight from arresting officer).

Victim Rosendary was treated for 13 gunshot wounds, seven of which were entry wounds, showing Defendant's specific intent to kill. Rosendary was shot in his stomach, a vital area of his body, causing him to now need a colostomy bag. *See Commonwealth v. Robertson*,

20

874 A.2d 1200, 1207 (Pa. Super. 2005) (stating that a layperson can conclude that the stomach is a vital area of the body). Rosendary was shot several more times as he was lying defenseless on the ground.

The evidence established Davis, Jones, and Ebo-Wilson traveled from Pottstown to Norristown with loaded weapons to seek revenge for the Jordan Scott killing. The jury rejected Defendant Davis' testimony that shooting Rosendary was justified. The evidence supported the jury's verdict that Defendant Davis had a specific intent to kill Kendall Rosendary.

### 3. Possession of Instrument of Crime

"To sustain a conviction for [possession of an instrument of crime], the Commonwealth" must establish that the Defendant "(1) possessed an instrument of crime, (2) with intent to employ it criminally." *Commonwealth v. Miller*, 172 A.3d 632, 642 (Pa. Super. 2017); *See* 18 Pa. C.S. § 907(a). An "instrument of crime" includes "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa. C.S. § 907(d). This includes an object that "is regularly used by criminals," such as a gun. *Commonwealth v. Rios*, 371 A.2d 937, 941 (Pa. Super. 1977).

"All co-conspirators are responsible for actions undertaken in furtherance of the conspiracy regardless of their individual knowledge of such actions and regardless of which member of the conspiracy undertook the action." *See Commonwealth v. Galindes*, 786 A.2d 1004, 1011 (Pa. Super. 2001) (quoting *Commonwealth v. Hannibal*, 753 A.2d 1265, 1274 (Pa. 2000)) (sustaining weapons convictions where firearms were used in furtherance of a burglary). Defendant Davis admitted at trial of shooting a firearm towards Rosendary. As a co-conspirator, Davis' possession of an instrument of crime is imputed to Defendant Jones.

21

Constructive possession of an instrument of crime can be shown through "the intent and the ability to control the item" and at a minimum, "the evidence must show that the defendant knew of the existence of the item." *Commonwealth v. Gladden*, 665 A.2d 1201, 1206-07 (Pa. Super. 1995) (quoting *Commonwealth v. Nelson*, 582 A.2d 1115, 1119 (Pa. Super. 1990)). "[O]ur Supreme Court has long held that an 'appellant's use of a loaded gun on his victim is more than sufficient to establish his guilt of possession of an instrument of crime.'" *Commonwealth v. Santiago*, 980 A.2d 659, 662 (Pa. Super. 2009) (quoting *Commonwealth v. McNair*, 603 A.2d 1014, 1017 (Pa. 1992)). Furthermore, "possession may also be proved by circumstantial evidence." *Id.* at 1207. Photographs from Defendant's phone before the shooting showed images of Defendant in possession of firearms and an extended magazine. A Glock 27 was found near Defendant Jones when he was arrested and a revolver was found in his car after the shooting. The jury's conviction for possession of an instrument of crime is supported by the evidence of record.

## CONCLUSION

For the foregoing reasons, the court respectfully recommends that Defendant's judgment of sentence should be AFFIRMED.

BY THE COURT

Richard P. Haaz,                    J.

Copies sent on 10/23/19 to:
Kevin Steele, Esquire
Robert Falin, Esquire
Francis J. Genovese, Esquire
Superior Court of Pennsylvania

Judicial Secretary

22